IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

YVONNE CHAMBERS,

                    Plaintiff,                            No. 3:10-CV-1094-HZ

    v.

MICHAEL J. ASTRUE,                    OPINION & ORDER
Commissioner of Social Security,

                    Defendant.

Merrill Schneider
SCHNEIDER LAW OFFICES
P.O. Box 14490
Portland, Oregon 97293

       Attorney for Plaintiff

Dwight Holton
UNITED STATES ATTORNEY
District of Oregon
Adrian L. Brown
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2902

1 - OPINION & ORDER

L. Jamala Edwards
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S/ 221A
Seattle, Washington 98104-7075

      Attorneys for Defendant

HERNANDEZ, District Judge:

      Plaintiff Yvonne Chambers brings this action seeking judicial review of the

Commissioner's final decision to deny disability insurance benefits (DIB). This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g). I reverse the Commissioner's decision.

## PROCEDURAL BACKGROUND

      Plaintiff applied for DIB on August 18, 2005, alleging an onset date of April 24, 2004.

Tr. 55-60. Her application was denied initially and on reconsideration. Tr. 40-42, 46-50.

      On January 9, 2008, plaintiff appeared, with counsel, for a hearing before an

Administrative Law Judge (ALJ). Tr. 965-96. On February 14, 2008, the ALJ found plaintiff

not disabled. Tr. 11-22. The Appeals Council denied review. Tr. 4-6A.

## FACTUAL BACKGROUND

      Plaintiff alleges disability based on having hepatitis C, osteoarthritis, degenerative disc

disease, and degenerative joint disease. Tr. 47. At the time of the hearing, she was fifty-two

years old. Tr. 969. She has a college degree in "general studies," and has past relevant work

experience in various office-related jobs such as operations clerk, office clerk, human resources

assistant, and administration clerk. Tr. 969, 993-94. She also worked as a sales associate at a

convenience store and as a cashier. Tr. 993-94.

2 - OPINION & ORDER

The issues raised by plaintiff primarily concern her neck pain. I recite some of the pertinent medical history here, and then, because the parties are familiar with the medical and other evidence of record, I refer to additional relevant facts necessary to my decision in the discussion section below.

Plaintiff developed neck pain while in the service, and in October 1999 was diagnosed with cervical spondylosis from C3-4 to C7-T1. Tr. 16; see also 436-48 (medical board report recommending plaintiff's medical discharge from military service due to arthritis, cervical arthrosis at multiple levels, and mild intermittent radiculopathty at C5, C6, or C8 due to the cervical arthrosis). Based on a May 2000 diagnosis of cervical spondyloses with spinal stenosis and bilateral foraminal stenosis at C 4/5, C 5/6, and C 6/7, plaintiff underwent cervical spinal fusion from C4 to C7 on May 25, 2000. Tr. 237-38. At the time, plaintiff was employed by the military as a civilian and lived in Germany.

Plaintiff initially had "good" results from the surgery, although she later began to experience some pain. Tr. 330. In January 2001, she had increased neck pain which her doctor attributed to overexertion. Id. Rest and physical therapy were prescribed. Id. In April 2002, she complained of increased neck pain for three months with numbness of the left arm upon turning her head to the left. Tr. 331. X-rays showed pseudoarthritis at C 6/7 with foraminal narrowing. Id. She was treated with hot packs and "manual therapy." Id. In January 2003, her pain complaints were noted to be "sporadic," and she had started to train with a cross-trainer. Id. She continued to receive hot packs and "manual therapy." Id. In November 2003, she had pain complaints at rest, especially with the onset of cold winter weather. Id. In January 2004, she complained of increased neck pain as a result of being more physically challenged at work. Id.

3 - OPINION & ORDER

She was continued on hot packs and "manual therapy." Id. Additionally, she received a muscle relaxant to take at night[1], and a non-steroidal anti-inflammatory drug (NSAID) for pain.[2] More intensive physical therapy was also recommended. Id.; see also Tr. 149 (visit summary for January 13, 2004 with German neurosurgeon Dr. Zink).

Plaintiff returned to the United States in 2004, and began treatment at the Portland Veteran's Administration Medical Center (VAMC). Cervical spine x-rays taken on June 23, 2004 revealed prominent anterior osteophytes at the C3-4 disc space as well as disc space narrowing of the C3-4 and C7-T1 disc spaces. Tr. 508-09. Prominent degenerative changes at the C7-T1 space were noted, as well as mild osseous foraminal bilateral encroachment, most notable involving the left C3-4, C6-7, and C7-T1 levels, and right C7-T1 and C3-4 foramina. Id. A cervical MRI performed on July 13, 2004 showed multi-level cervical spondyloarthropathy. Tr. 505-06.

On July 30, 2004, plaintiff was examined by Robert Welsh, P.A.C.[3], to determine whether she was entitled to an increase in her VA disability rating. Tr. 145-48. At the time, she reported no numbness or tingling in her hand or arms, but she complained of continuing neck

---

[1] The drug she was prescribed, Tetrazepam, is in the "benzodiazepine group," and is used in certain European countries as a muscle relaxant. See http://www.drugs.com/international/tetrazepam.html.

[2] The medication, Novalgin, is available in several countries outside the United States and is used as an analgesic and anti-inflammatory medication. See http://www.drugs.com/international/novalgin.html, http://www.drugs.com/international/metamizole.html

[3] The record does not reveal what "P.A.C." stands for, although perhaps it is a designation for a physician's assistant. Welsh's report appears to have been approved by Paul Matson, M.D. Tr. 148.

4 - OPINION & ORDER

pain which was particularly aggravated by overhead repetitive motion.  Tr. 146.  She was

working only part-time, and lived with her sister, so she was able to avoid lifting or carrying

which increased her pain.  Id.  Repetitive movements and driving also increased her pain.  Id.

She experienced pain when sitting too long, but performing isometric stabilization exercises

every fifteen minutes to every hour helped her manage.  Id.  She was taking Tylenol for pain, as

well as muscle relaxants.  Id.

     After a physical exam, Welsh assessed plaintiff as having degenerative disc disease and

degenerative joint disease with muscle spasms and chronic strain of the erector spinae group.  Tr.

147.  Welsh believed that plaintiff had lost between fifty and sixty-five percent of her range of

motion, strength, coordination, and "fatiguability."  Id.  She was able to perform only a limited

amount of repetitive movements.  Id.  Welsh explained that plaintiff's pain had increased in

November 2003 when she went from part-time to full-time work, and she had been unable to

calm her neck down since that time.  Id.

     Welsh stated that there were no surgical options for plaintiff, and it was expected that she

would have periodic flares with repetitive movement, where she would lose an additional ten

percent of her range of motion, strength, coordination, and "fatiguability" which would last a day

at a time.  Id.  He noted that "laborous jobs of lifting or carrying" were not recommended for her.

Id.

     A CT scan in January 2005 showed mild degenerative changes from C4 to C7, without

significant stenosis, and, at the C3-4 level, uncovertebral osteophytes resulting in mild-to-

moderate right neural foraminal stenosis, but without significant central canal stenosis.  Tr. 503-

04.

In February 2005, plaintiff was referred to Tai Chi classes for the purposes of stretching, increasing her sense of well-being, and learning relaxation skills.  Tr. 618.  She has continued to participate in these classes with the VAMC, about an hour per week.  Tr. 618-964 passim.  Also as of February 2005, plaintiff was taking oxycodone for pain and the muscle relaxant cyclobenzaprine[4].  Tr. 616.

In April 2005, plaintiff complained that the oxycodone was making her nauseated.  Tr. 898.  In October 2005, she told her VAMC primary care provider Dr. Lenore Fines, M.D., that she still suffered from chronic neck pain and that she had trouble taking the bus to Tai Chi classes because it went over bumps, causing pain to shoot up her neck.  Tr. 874.  Plaintiff was given a trial of Vicodin.  Id.  In December 2005, plaintiff was still taking the Vicodin and the muscle relaxant.  Tr. 859.  However, in January 2006, she cut back on the dose of the muscle relaxant because it was making her "really tired."  Tr. 852.  By March 2006, she reported that the Vicodin and the muscle relaxants were working "pretty well" for her neck pain.  Tr. 847.

In May 2006, plaintiff reported needing more Vicodin for her neck pain.  Tr. 796.  She requested a "pain patch" in lieu of continually increasing the Vicodin dose.  Tr. 794.   Dr. Fines prescribed methadone for plaintiff's pain rather than a patch because she felt that a long-acting narcotic would be better.  Tr. 787.  Plaintiff signed a Treatment Agreement regarding the use of narcotic medicines.  Tr. 787-91.  On June 6, 2006, plaintiff reported that the pain control on methadone was excellent, but she noted that it caused some cognitive impairment.  Tr. 782.  Dr. Fines recommended decreasing the dose.  Id.  On July 11, 2006, plaintiff reported the pain

---

[4]  http://www.ncbi.nlm.nih.gov/pubmedhealth/?term=cyclobenzaprine.

control as good, and described her pain level as "about a 1." Tr. 780.

In September 2007, plaintiff missed Tai Chi classes because of back pain. Tr. 714. In October 2007, plaintiff told Dr. Fines that taking the methadone in the morning was making her groggy, but that if she took the dose in the evening, she had more pain in the morning. Tr. 714. Dr. Fines suggested splitting the dose between the morning and the evening. Id.

SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

Disability claims are evaluated according to a five-step procedure. See Valentine v. Commissioner, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability). The claimant bears the ultimate burden of proving disability. Id.

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d),

416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner

proceeds to step four. Yuckert, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any

impairment(s), has the residual functional capacity (RFC) to perform "past relevant work." 20

C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can, the claimant is not disabled. If the

claimant cannot perform past relevant work, the burden shifts to the Commissioner. In step five,

the Commissioner must establish that the claimant can perform other work. Yuckert, 482 U.S. at

141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets his burden

and proves that the claimant is able to perform other work which exists in the national economy,

the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

## THE ALJ'S DECISION

At step one, the ALJ determined that plaintiff had not engaged in substantial gainful

activity since her alleged onset date through her date of last insured. Tr. 16. Next, at steps two

and three, the ALJ determined that plaintiff had severe impairments of hepatitis C, a history of a

cervical fusion, depression, and vertigo, but that the impairments did not meet or equal, either

singly or in combination, a listed impairment. Tr 16-19,

At step four, the ALJ concluded that plaintiff had the residual functional capacity (RFC)

to perform light work with the following limitations: she can bend only occasionally, she should

avoid extremes of cold temperatures and active hazardous work areas, she is able to perform

semi-skilled work but not skilled work, and she needs to be able to change positions from sitting

to standing, and to stretch, for a few minutes every hour. Tr. 19. With this RFC, the ALJ

determined that plaintiff was able to perform her past relevant work as a human resources

assistant and administrative/office clerk.  Tr. 22.  Thus, the ALJ determined that plaintiff was not disabled.  Id.

STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole.  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. (internal quotation omitted).  The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision.  Id.; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed."  Vasquez, 572 F.3d at 591 (internal quotation and brackets omitted); see also Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's") (internal quotation omitted).

DISCUSSION

Plaintiff contends that the ALJ made the following errors:  (1) rejecting plaintiff's subjective testimony; (2) rejecting the opinion of her treating physician; (3) failing to sufficiently discuss and give weight to the state agency medical consultant's opinion; (4) failing to evaluate lay testimony; and (5) improperly evaluating a Veteran's Administration (VA) disability rating.

I.  Plaintiff's Subjective Testimony

Plaintiff testified at the hearing that she resigned from her job in Germany because her

health was getting worse and she wanted to be closer to a VA hospital.  Tr. 970.  She was having increased pain and her hepatitis C symptoms were worsening.  Id.  She testified that she was "80 percent" VA disabled, related to her spine and "some female kind of problems."  Id.

After her surgery in 2000, her pain improved, but it gradually came back over the next couple of years.  Tr. 974.  At the time of the hearing, it was worse than it had been before surgery.  Id.  Sitting can cause sharp pains to the back of her head.  Tr. 976-77.  This occurs when she sits and does not have the opportunity to "rotate out of that periodically."  Tr. 977.  Cold weather aggravates her symptoms, causing more stiffness and less range of motion.  Id.

Although plaintiff noted that the methadone takes care of her pain "pretty well," she described experiencing several side effects as a result of taking the medication:  it affects her memory, makes her depressed, and makes her constipated.  Tr. 978.  She does not like feeling addicted to it.  Id.

Plaintiff testified that her neck is her worst problem, but she also described experiencing morning nausea as a result of having hepatitis C.  Tr. 979-80.

Plaintiff cannot drive because she cannot turn her head far enough to see well.  Tr. 980.  She takes the bus daily, walking one and one-half blocks to the bus stop.  Id.  Plaintiff thought she could probably stroll several blocks.  Tr. 982.  She thought she could stand for an hour at a time, but not in an amount that would equal six hours in an eight-hour day.  Tr. 983.  She thought she could probably stand a total of two hours in an eight-hour day.  Id.  She also thought she could sit, as long as she could move and have the flexibility to do certain movements to keep her neck loose.  Tr. 983-84.  However, she did not believe she could sit and use her hands.  Tr. 984.

Based on a restriction from her doctor in 2002, plaintiff said she should not lift more than

eleven pounds.  Tr. 984-85.  She also said she could not lift ten pounds for one-third of the day because sharp pain would "kick in."  Tr. 985.

Plaintiff further described the unpredictability of her symptoms, making it difficult for her to show up five days per week at a job.  Tr. 987.  She indicated that she might work one day, then wake up nauseated the next day, requiring her to lie down for a few hours until she could ingest something more than water.  Id.  Alternatively, the methadone will sometimes make her incoherent and feel like she is drunk, requiring her to lie down.  Id.

Plaintiff also described that she attends Tai Chi classes through the VA, once per week for about 45 minutes per class.  Tr. 988.  The class consists of slow movements and keeps her from tightening up.  Id.  It also helps with her stress.  Id.  At one point, because she had taken the class before, she volunteered to help the instructor demonstrate moves when there were several new students.  Tr. 988-89.  The yoga class also meets one time per week with a volunteer teacher at the VA.  Tr. 989.  According to plaintiff, it is a restorative type of yoga where the participants primarily practice breathing and relaxation.  Id.  It is not a physical type of yoga.  Tr. 989.

Finally, plaintiff explained that as a way to combat depression, she volunteered with a teen mother group through the Youth Employment Institute, as a sort of mentor or friend.  Tr. 990-92.  She goes twice per week if she can, and stays two to three hours each time.  Id.  Mostly she talks to the teens about certain parenting skills or helps them with basic math skills.  Tr. 991.  Sometimes she misses her time because of her own medical problems.  Tr. 991-92.  Because it is a volunteer position, there is no pressure to show up or perform.  Tr. 991.  If she does not want to go, she does not go.  Id.

The ALJ found that while plaintiff's medically determinable impairments could

reasonably be expected to produce the symptoms she alleged, her statements concerning the

intensity, persistence, and limiting effects of her symptoms were not entirely credible.  Tr. 21.

      The ALJ is responsible for determining credibility.  Vasquez, 572 F.3d at 591.  Once a

claimant shows an underlying impairment and a causal relationship between the impairment and

some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony

if there is no evidence of malingering.  Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th

Cir. 2008) (absent affirmative evidence that the plaintiff is malingering, "where the record

includes objective medical evidence establishing that the claimant suffers from an impairment

that could reasonably produce the symptoms of which he complains, an adverse credibility

finding must be based on 'clear and convincing reasons'").

      When determining the credibility of a plaintiff's complaints of pain or other limitations,

the ALJ may properly consider several factors, including the plaintiff's daily activities,

inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and

relevant character evidence.  Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995).  The ALJ may

also consider the ability to perform household chores, the lack of any side effects from prescribed

medications, and the unexplained absence of treatment for excessive pain.  Id.

      Additionally, while the ALJ may consider objective medical evidence, the ALJ may not

reject the claimant's subjective pain or symptom testimony based solely on a lack of such

evidence.  20 C.F.R. §§ 404.1529(c), 416.929(c); Rollins v. Massanari, 261 F.3d 853, 856, 857

(9th Cir. 2001) ("Once a claimant produces objective medical evidence of an underlying

impairment, an ALJ may not reject a claimant's subjective complaints based solely on a lack of

objective medical evidence to fully corroborate the alleged severity of pain[;] . . . While

subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects.") (internal quotation and brackets omitted) .

In the instant case, the ALJ does not clearly delineate the basis for rejecting plaintiff's subjective testimony.  Page eight of his decision contains a long discussion which is the heart of his findings.  But, the pertinent paragraph includes information regarding the objective medical evidence, plaintiff's symptoms of depression, and her activities of daily living.  Tr. 21.  The last one-third of this paragraph focuses on Dr. Fines's opinion, discussed below.  Tr. 21-22.  It appears from the ALJ's decision that the ALJ pointed to objective medical evidence and plaintiff's daily activities as reasons to reject her subjective testimony.

In regard to her neck pain, the ALJ noted that plaintiff had a cervical fusion and some neural foraminal narrowing, but did not have nerve entrapment, radiculopathy, or compression as shown by electromyography (EMG).  Tr. 21.  He also noted that examinations showed some limitation of motion typically seen in patients with fusion.  Id.  He noted she still had pain in her neck and right arm for which she was on methadone.  Id.  His only other comment as to the objective medical evidence regarding plaintiff's neck pain was that in 2004 and 2005, examiners "basically stated that she should avoid laborious work activity[.]"  Id. (citing Tr. 526-27).[5]

_____

[5]  The ALJ erred in his reference to examiners offering this opinion in both 2004 and 2005.  In support of his statement, the ALJ cites to a copy of Welsh's July 30, 2004 report regarding an increase in plaintiff's VA disability rating for her spine.  Tr. 526-27 (Ex. 3F at pp. 471-72).  This is a reprint of Welsh's report contained in a sixty-four page VA Health Summary, printed on November 9, 2005.  Tr. 513-76.  The copy of the original of Welsh's report is found at pages 145-48 of the Administrative Record.  Tr. 145-48.  Other than the fact that the second page of the document cited by the ALJ contains a completely separate progress note by a separate

Next, the ALJ explained that plaintiff's activities of daily living were not "grossly limited" because she took the weekly Tai Chi class, she volunteered as a Tai Chi instructor for a period of time, she did "some yoga" once per week, she mentored teenagers twice per week to assist them in getting their GED and helping with their homework, and she used public transportation daily to get to her appointments and activities. Tr. 21.

Finally, while discussing Dr. Fines's opinion, the ALJ mentioned that plaintiff's sister had submitted a statement indicating that plaintiff could walk one hour at a time, visited with neighbors, walked a dog, cooked, and took care of plants and a garden. Tr. 22. Although it is not quite clear from the ALJ's opinion, I assume that the ALJ relied on plaintiff's sister's report of plaintiff's activities as further evidence in support of his determination that plaintiff's testimony was not credible.

The problem, however, is that the evidence cited by the ALJ is not inconsistent with plaintiff's testimony and/or does not provide clear and convincing reasons to reject plaintiff's testimony. The ALJ cited to certain medical evidence regarding plaintiff's neck pain, but he failed to explain why it undermines her testimony. Although the EMG studies may have been normal, the x-rays, MRI, and CT scan still showed that plaintiff had prominent anterior osteophytes at the C3-4 disc space as well as disc space narrowing of the C3-4 and C7-T1 disc spaces, prominent degenerative changes at the C7-T1 space, mild osseous foraminal bilateral encroachment, most notable involving the left C3-4, C6-7, and C7-T1 levels, and right C7-T1 and C3-4 foramina, multi-level cervical spondyloarthropathy, and uncovertebral osteophytes

---

practitioner from a date in 2005, and which makes no mention of plaintiff's activity level, it is unclear how the ALJ found that multiple examiners suggested she avoid laborious work activity.

resulting in mild-to-moderate right neural foraminal stenosis.  Tr. 503-04, 505-06, 508-09.

Welsh's statement that plaintiff could not perform "laborous jobs of lifting or carrying" is vague

because it is unclear if he meant that all lifting and carrying is laborious and he did not reveal

what he actually considered to be laborious.  Furthermore, stating that plaintiff cannot perform

such "laborous" jobs does not indicate what she can perform.

The ALJ also failed to consider the full explanation of plaintiff's Tai Chi and yoga

classes.  As plaintiff explained, the Tai Chi class meets for forty-five minutes once per week, and

consists of very slow movements.  This is not vigorous exercise and plaintiff's participation in

such an activity is simply not a clear and convincing reason to reject her testimony.  The yoga

class, also a once per week activity, consists of breathing exercises while prone.  Again, this is

not inconsistent with testimony claiming limited range of motion, pain upon repetitive motion,

limited ability to lift, and an inability to stand for more than two hours in an eight-hour day.

Moreover, the ALJ's conclusion regarding the Tai Chi class puts plaintiff in an impossible

position.  Given that the VA physician recommended that she try Tai Chi to reduce her stress and

increase her mobility, her subjective testimony would be vulnerable if she failed to pursue this

treatment option.  As it is, she is compliant, yet the ALJ faults her because her compliance

shows, in the ALJ's opinion, that she can actually work.  But, the case law is clear that plaintiff

does not have to be "'utterly incapacitated' in order to be disabled."  Vertigan v. Halter, 260 F.3d

1044, 1050 (9th Cir. 2001).  The level of activity required for the Tai Chi class is not inconsistent

with plaintiff's testimony regarding her limitations.

Plaintiff's volunteer activity, while involving a bit more time, is flexible and carries no

consequence if she fails to show up.  The activity does not appear to require her to sit or stand for

certain periods of time, and does not require her to lift.  Furthermore, plaintiff's use of public

transportation is not inconsistent with the limitations she described.  She catches the bus one and

one-half blocks from home.  There is no evidence that she is on the bus for lengthy periods of

time.  And, according to plaintiff, it is not necessarily a pain-free experience.  When the bus goes

over bumps, it increases her pain.  Her options are limited given that her neck pain and limited

range of motion preclude driving.  Her ability to ride a bus several times per week is not

inconsistent with her testimony that her pain precludes her from sustaining full-time

employment.

Plaintiff herself testified she could stroll several blocks and could stand for one hour at a

time.  This is not inconsistent with plaintiff's sister's testimony that plaintiff walked a neighbor's

dog.  Moreover, the ALJ somewhat mischaracterized plaintiff's sister's testimony.  According to

the ALJ, plaintiff's sister reported that plaintiff could walk one hour at time.  But, plaintiff's sister

actually stated that plaintiff's ability to engage in various activities of daily living "depends on

how bad she's hurting. . . and [s]he could <u>maybe</u> walk for an hour before having to stop and rest."

Tr. 144 (emphasis added) (January 8, 2008 statement).  Her sister also indicated that plaintiff has

to lie down every one and one-half hours, that she cannot carry anything and walk, that she

cannot lift more than ten pounds, and that plaintiff's sister helps with cooking and does the

mopping, vacuuming, and bathroom cleaning.  <u>Id.</u>  Also, in a previous statement, made

September 14, 2005, plaintiff's sister described plaintiff's day as consisting of certain activities,

punctuated by periods of rest and use of a heating pad.  Tr. 124.  The ALJ extracted the activities

performed, but ignored the periodic rests required.  A full reading of plaintiff's sister's September

2005 statement shows that at that time, she described plaintiff as being unable to lift more than a

16 - OPINION & ORDER

gallon jug of water, limited to one hour of walking, sitting, or climbing, experiencing pain with

reaching, being forgetful, and dropping things.  Tr. 129.

In summary, the ALJ did not carefully explain his reasons for rejecting plaintiff's

testimony.  A generous reading of his decision indicates that he concluded that the objective

medical evidence and plaintiff's daily activities showed that her subjective symptom testimony

was not credible.  However, the ALJ failed to explain how the objective medical evidence

demonstrated that plaintiff could engage in more activity than she claimed.  The ALJ

mischaracterized the nature of plaintiff's daily activities and failed to consider the full tenor of

plaintiff's sister's statements regarding plaintiff's activities.  As such, the reasons given by the

ALJ for rejecting plaintiff's testimony are not clear and convincing.

II.  Plaintiff's Treating Physician

At the time of the hearing, Dr. Fines had been plaintiff's treating physician for about three

and one-half years.  Tr. 916.  On December 3, 2007, Dr. Fines wrote a letter in support of

plaintiff's claim for SSD.  Tr. 643.  There, Dr. Fines listed plaintiff's eight separate medical

problems:  (1) chronic hepatitis C, genotype 1, low viral load; (2) status post total abdominal

hysterectomy with right salpingo-oophorectomy secondary to ovarian cyst in 1988; (3) status post

left salpingo-oophorectomy secondary to pelvic inflammatory disease in 1986; (4) degenerative

joint disease, cervical spine, with cervical spondylosis and spinal stenosis, C4-5, C5-6, C6-7;

status post diskectomy at C4 through C7 in 2000; (5) gasoesophageal reflux disease (GERD); (6)

hypertension; (7) chest pain; and (8) vertigo.  Tr. 643-44.  Dr. Fines included the results of the

January 2005 cervical spine CT scan, and the July 2004 cervical spine MRI.  Tr. 643.  She further

noted that plaintiff suffered from chronic neck pain and required chronic narcotic pain

17 - OPINION & ORDER

medication with a current dose of 10 milligrams/day of methadone.  Tr. 644.  Dr. Fines listed

several other prescription medications plaintiff was taking regularly, including a muscle relaxant.

Id.  She also noted that plaintiff took non-prescription naproxen[6] as needed.  Id.  Dr. Fines closed

her letter by stating that she supported plaintiff's request for disability.  Id.

      A few weeks later, in January 2008, Dr. Fines completed a questionnaire regarding

plaintiff's limitations sent to her by plaintiff's counsel.  Tr. 916-19.  There, she noted that she had

been plaintiff's primary care physician since June 17, 2004, and that plaintiff suffered from

hepatitis C, osteoarthritis, degenerative joint disease of the cervical spine with cervical

spondylosis and stenosis, hypertension, and vertigo.  Tr. 916-17.  She listed the symptoms

plaintiff experienced as a result of these conditions as chronic pain, nausea, fatigue, and cognitive

impairment from her pain medication.  Tr. 917.  She rated plaintiff as being able to (1) lift and

carry less than ten pounds if required to do so frequently or occasionally five days per week, (2)

stand and walk a total of two hours in an eight-hour workday if she had to do so five days per

week, and (3) sit a total of two hours in an eight-hour workday if she had to do so five days per

week.  Id.  Dr. Fines also assessed plaintiff as being limited by her upper extremities in her ability

to push and/or pull.  Id.  According to Dr. Fines, it is medically necessary for plaintiff to lie down

once per day for one to two hours.  Id.

      Dr. Fines indicated that plaintiff could never climb, never reach overhead, and never

engage in fingering/fine manipulation.  Tr. 918.  Plaintiff could occasionally balance,

stoop/bend, kneel, crouch, crawl, handle/gross manipulation, and "feel."  Id.  She opined that

---

     [6] Naproxen is an NSAID used to relieve arthritis pain, among other things.
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000526/

18 - OPINION & ORDER

plaintiff would miss more than two days per month from a sedentary job as a result of dizziness,

fatigue, and difficulty with cognitive impairment due to her pain medication.  Id.  She noted that

plaintiff experiences cognitive impairment and constipation as side effects of her medications.

Id.  Dr. Fines rated plaintiff as markedly impaired in her concentration, persistence, and pace as a

result of her impairments and medications.  Id.

      The ALJ found that Dr. Fines's findings were not supported by objective medical

evidence.  Tr. 21.  The ALJ noted that Dr. Fines's opinion was "basically a check blocked form

done after the hearing."  Id.  Then, the ALJ's focus appears to be on Dr. Fines's comments

regarding plaintiff's cognitive impairment:

> While the claimant does have a diagnosis of cervical disease, it has never been
> mentioned in Dr. Fines' records that the claimant has cognitive limits because of
> her pain medications.  In fact, the claimant does quite well.  She participates in
> regular Tai Chi classes to the extent that she volunteered to teach a class, she
> mentors teenagers in acquiring their GED and doing their homework twice a
> week, and she rides the bus daily to her appointments.  These activities are not
> indicative of one that has cognitive limitations due to pain medications.
> Furthermore, the other limitations of Dr. Fines that the claimant cannot perform
> even sedentary work are discounted by both the testimony of the claimant as well
> as the statement by her sister.  Her sister reported in her statement that the
> claimant can walk one hour at a time . . . .  The sister also reported in another
> statement that the claimant visits neighbors, walks a dog, cooks daily, takes care
> of plants and gardens.  The claimant activities as noted above show no cognitive
> limits and certainly do not appear to preclude the performance of sedentary work.
> Thus, Dr. Fines' limitations are not given any weight as they are contradicted by
> the claimant's acknowledged activities of daily living.

Tr. 21-22.

      Plaintiff argues that the ALJ improperly rejected Dr. Fines's assessment.  I agree.

      If the treating physician's opinion is not contradicted, the ALJ may reject it only for "clear

and convincing" reasons.  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Id.  Even if the

19 - OPINION & ORDER

treating physician's opinion is contradicted by another doctor, the ALJ may not reject the treating physician's opinion without providing "specific and substantial reasons" which are supported by substantial evidence in the record.  Id.

As I read the ALJ's opinion, he gave three reasons for rejecting Dr. Fines's opinion:  (1) it was in a "checked block" form and made after the hearing; (2) the reference to plaintiff's cognitive impairment was not mentioned in Dr. Fines's records; and (3) the limitations were contradicted by plaintiff's activities of daily living.

The ALJ's dismissal of Dr. Fines's opinion because of the format in which it was presented is not a clear and convincing reason for rejecting her opinion in this case.  Dr. Fines indicated she had been the plaintiff's treating physician for three and one-half years, she stated that her opinion was based on her knowledge, treatment, and observation of plaintiff, she offered some narrative explanations in the form, and most importantly, the record contains chart notes, visit summaries, treatment records, and test results documenting Dr. Fines's familiarity with plaintiff's medical problems over the three and one-half years she had been treating plaintiff at the time she completed the form.

Although medical opinions contained in a check-the-box type form may be properly rejected when they are unaccompanied by any explanation of the basis for the opinion, e.g., Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996), here, given the years of chart notes and the information contained in her December 2007 letter, as well as the short explanations contained in the January 2008 form, Dr. Fines's opinion, when viewed in context, is based on her clinical findings and observations and is not conclusory.  See Coffman v. Astrue, No. CV-07-1082-CL, 2008 WL 5429653, at 5-6 (D. Or. Dec. 31, 2008) (attorney-created "check the box" questionnaire

was not "merely brief and conclusory" when it also provided an option for the medical professionals to comment and support their selections).  In this case, it is error to consider the "check box form" in isolation.  Additionally, her opinion was solicited before the hearing and nothing in the record suggests that the hearing affected her opinion in any way.

The ALJ further erred when he determined that Dr. Fines had not previously mentioned the negative effect on plaintiff's cognitive ability caused by her pain medication.  In a chart note dated July 6, 2006, Dr. Fines noted that the methadone was causing cognitive impairment.  Tr. 782.  In a separate chart note entered by VAMC Licensed Practical Nurse Debra Jackson on April 26, 2007, it is noted that plaintiff has cognitive difficulties of "short term loss."  Tr. 740.  Plaintiff also complained to Dr. Fines in October 2007 that the methadone was making her feel groggy.  Tr. 714.  Thus, Dr. Fine's opinion expressed in January 2008 that plaintiff's pain medication impaired her cognitive abilities is supported by evidence in the VAMC records.

The ALJ relied on plaintiff's activities to reject Dr. Fines's opinion regarding plaintiff's cognitive impairments and plaintiff's physical limitations.  The ALJ specifically cited plaintiff's Tai Chi classes, her willingness to volunteer to teach a Tai Chi class, her teen mentoring, and her ability to ride the bus daily, as evidence undermining Dr. Fine's opinion that plaintiff's medication impacts her cognitive abilities.  But, as explained above, the Tai Chi and the mentoring appear to require little effort, either physical or mental.  The Tai Chi class, as described by plaintiff, is limited in frequency and duration, and is a series of slow movements. The mental ability to sustain that activity, and even to occasionally volunteer to help teach it, is simply not equivalent to the mental ability required to adequately perform full-time work. Plaintiff's mentoring consists of a few hours per week being friends to teen mothers, and helping

21 - OPINION & ORDER

them with various parenting skills or basic homework.  This also is not inconsistent with the grogginess that plaintiff experiences on methadone given that the frequency and duration of the mentoring are limited and plaintiff is free to cancel if she is not feeling well.  And, as any public transportation rider knows, people of varying cognitive abilities successfully ride public buses.

Importantly, Dr. Fines did not opine that plaintiff would miss more than two days of work per month based solely on a cognitive impairment.  Tr. 918.  Instead, she also cited plaintiff's morning nausea which the record shows as being caused by her hepatitis C, her dizziness which is an entirely separate disorder, and fatigue.  Id.  Dr. Fines also concluded that plaintiff's marked impairment in concentration, persistence, and pace was caused by her impairments as well as her medications and their side effects.  Thus, to the extent the ALJ rejected Dr. Fines's limitations because her reliance on a cognitive impairment was inconsistent with plaintiff's daily activities, the ALJ misread Dr. Fines's opinion.  Because the ALJ failed to address the other components of Dr. Fines's opinion, the ALJ's reasons for rejecting the opinion are not clear and convincing.

Next, as explained above, the ALJ did not consider plaintiff's sister's statements in context.  Moreover, Dr. Fines's limitations are consistent with plaintiff's sister's descriptions of plaintiff's abilities.  Like Dr. Fines, plaintiff's sister indicated that plaintiff could lift no more than ten pounds.  Tr. 124 (cannot lift a gallon jug of water without pain); Tr. 144 (should not be lifting over ten pounds).  Similar to Dr. Fines's opinion that plaintiff could stand and walk no more than two hours in an eight-hour day, plaintiff's sister indicated that plaintiff could possibly walk an hour before needing to stop and rest.  Tr. 144 (also noting that plaintiff could stand for two hours on a good day); see also Tr. 124 (plaintiff's sister opined plaintiff could walk forty-five minutes before stopping and resting).  And, plaintiff's sister's description of plaintiff's daily activities

22 - OPINION & ORDER

includes a reference to plaintiff needing to rest.  Tr. 124.  Similarly, Dr. Fines indicated that

plaintiff would need to lie down once a day for one to two hours.  Tr. 917.

       The ALJ cited plaintiff's activities as described by plaintiff and her sister, as contradictory

of Dr. Fines's limitations.  But, a careful reading of plaintiff's sister's statements and of plaintiff's

testimony shows that these statements actually support Dr. Fines's assessment of plaintiff's

limitations.  The record does not support the ALJ's rejection of Dr. Fines's opinion.

III.  Other Alleged Errors

       Given my conclusion that the ALJ erred in rejecting plaintiff's testimony and in rejecting

Dr. Fines's opinion, there is no need to consider plaintiff's additional arguments.

IV.  Remand for Benefits

       Plaintiff contends that the case should be remanded for a determination of benefits

because when the improperly rejected testimony is credited as true, an award of benefits is

appropriate.  The decision whether to remand for further proceedings or for immediate payment

of benefits is within the discretion of the court.  Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir.

2000).  The issue turns on the utility of further proceedings.  A remand for an award of benefits is

appropriate when no useful purpose would be served by further administrative proceedings or

when the record has been fully developed and the evidence is insufficient to support the

Commissioner's decision.  Rodriguez v. Bowen, 876 F.2d 759, 763 (9th Cir. 1989).

       Under the "crediting as true" doctrine, evidence should be credited and an immediate

award of benefits directed where "'(1) the ALJ has failed to provide legally sufficient reasons for

rejecting such evidence, (2) there are no outstanding issues that must be resolved before a

determination of disability can be made, and (3) it is clear from the record that the ALJ would be

23 - OPINION & ORDER

required to find the claimant disabled were such evidence credited.'" <u>Harman</u>, 211 F.3d at 1178

(quoting <u>Smolen v. Chater</u>, 80 F.3d 1273, 1292 (9th Cir. 1996)).  The "crediting as true" doctrine

is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining

whether to enter an award of benefits upon reversing the Commissioner's decision.  <u>Connett v.

Barnhart</u>, 340 F.3d 871, 876 (9th Cir. 2003) (citing <u>Dodrill v. Shalala</u>, 12 F.3d 915, 919 (9th Cir.

1993)); <u>Nguyen v. Chater</u>, 100 F.3d 1462, 1466-67 (9th Cir. 1996); <u>Bunnell v. Sullivan</u>, 947 F.2d

341, 348 (9th Cir. 1991).

     As explained above, the ALJ failed to provide legally sufficient reasons for rejecting

plaintiff's testimony and Dr. Fines's assessment of plaintiff's limitations.  Although the ALJ

stopped his analysis at step four when he determined that plaintiff could perform her past

relevant work, a remand for additional proceedings is unnecessary here because it is clear from

the record that the ALJ would be required to find claimant disabled were such evidence credited.

     During the hearing, the vocational expert (VE) testified that if, in addition to various

limitations related to plaintiff's exertional abilities, the claimant would be unable to perform

work on a "day in, day out basis," meaning the claimant would be missing hours, half-days, or

whole days amounting to at least two or more days a month more than the employer would

normally allow, the claimant could not maintain competitive employment.  Tr. 994-95.  When

plaintiff's and Dr. Fines's statements are credited, and when the VE testimony is considered, the

record demonstrates that plaintiff's limitations preclude her from maintaining competitive

employment.  Accordingly, a remand for a determination of benefits is appropriate.

/ / /

/ / /

24 - OPINION & ORDER

CONCLUSION

The Commissioner's decision is reversed and remanded for an award of benefits.

IT IS SO ORDERED.


Dated this __18th_____ day of ___August_____, 2011



_/s/ Marco A. Hernandez_____
Marco A. Hernandez
United States District Judge

25 - OPINION & ORDER